Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Michael B. Hyman presiding, case number 17-0845, People v. Lemar Scott. Good afternoon. My name is Justice Michael B. Hyman. With me is Justice Carl Walker and Justice Sanjay Taylor. Each side will have 20 minutes. The appellant can each in turn pronounce yourselves and for the appellant how much time you want for rebuttal. Thank you, your Honor. I'd like to reserve five minutes for rebuttal. Okay. And you're Elizabeth Cook. Yes, I am. Good afternoon, your Honors. Assistant State's Attorney Sarah McGann on behalf of the people. Thank you. So you may proceed. Good afternoon. May it My name is Elizabeth Cook from the Office of the State Appellate Defender, representing Lemar Scott. After this court ordered a remand for a new crankle inquiry in front of a different judge, Lemar Scott spoke at length regarding his trial attorney's performance. I would like to draw this court's attention to two specific allegations of ineffectiveness, the first relating to his attorney's interference with his right to testify, and the second relating to known witnesses Scott wanted his attorney to call at trial. First, Scott stated after admonishment that he did not wish to testify at his trial. However, he was not asked if anyone pressured or coerced him into making this choice. How was he pressured or coerced? Is there anything in the record that says that he did attorney to speak with his mother? No, your Honor. He didn't say there's nothing in the record. That's correct. And that's my question. Is there anything in the record that said he did not give permission to speak with his mother? No, your Honor. He he he did not say that he did not give permission. Okay, so he gave permission. Or you think I mean, it's not in the record. So there's no problem then, with his counsel speaking with his mother. And that's that's my first question. Why don't we start there? Your Honor, what what he told the court at the Crankville inquiry was that his attorney approached his mother at a time when she was extremely emotionally vulnerable, because she had a child according to him. We've read the record. We read your briefs very carefully. Yes. But there's nothing to say that he knew about having the child on its deathbed. There's nothing to say that he just acknowledged that he wasn't to approach the mother. And it was your client's decision whether to abide by his mother's wishes or not. I mean, it's not about the mother's wishes. And he didn't want to go against his mother. That has nothing to do with the attorney. Well, according to what Ruffin, I'm sorry, according to what Scott said at the preliminary inquiry, Defense Counsel Ruffin's rationale was that he spoke to the mother because he believed that Scott could be found guilty on an on an accomplice liability theory, based on the account that Scott wanted to testify to, which was that he was outside attempting to sell marijuana to the victims at the time this offense occurred. And that was why they were called seeing him. And but this this advice, if that is what Ruffin said, was based on an incorrect theory of our application of accountability theory, because this supposed a drug transaction was not related to the charged offenses. But it has to do with he was arrested, found outside, isn't that correct? And the gun that was used was at his feet. Is that correct? Your Honor, my recollection is that the gun was found in a trash can close by the alley that he was walking through. Okay. And in addition, he there were witnesses at trial who several witnesses testified he was in the building at the time, just about the time of the robbery. Correct. Well, Your Honor, the witness accounts were somewhat inconsistent about that point. From what I recall, there was one witness who testified that he saw him pass. That was Nathaniel Howard, saw him passing by the building. I don't believe there was a witness who saw him in the building with Theodore Smith at the time the police recovered the pizzas. And in addition, it appears that there were a number of people in and around the building at that time, according to what Lawndell Favors testified, he was actually having a party that night. And there were quite a few people who were coming and going. According to my notes, Sass claimed Phillips would testify that he was in the apartment hallway at the time of the shooting. That's Scott's testimony. That Phillips was testified that he, Scott, was in the apartment hallway at the time of the shooting and saw one person committing the robbery. Are you saying that's not correct? No, Your Honor, excuse me, I'm not familiar with the name Phillips. I recall him mentioning his neighbor, Risa Phillips. Oh, oh, you're right. OK, I understand. Yes, the niece. Yes. So he was in the building at the time of the robberies. And then he was outside the building, apparently, when he got arrested. So I don't see where this argument has nothing to do with the mother. But in any event, it shows that he was in both places. Well, Your Honor, he lived in the building and, you know, like I was saying, a number of people were at the building at the time because of this gathering. So simply, you know, being at the wrong place the wrong time, it was exactly the defense that he pursued at trial. But he was at both places, apparently, at the wrong time. I'm trying to figure out what what was wrong with the defense counsel's strategy here. Well, our argument is that he defense counsel actively interfered with his with his exercise of his right to testify. That goes back to the mother, right? You're talking about the mother. Yes. And again, if there's nothing in the record about the permission, how can we have a rule? In your favor. I think I think this goes to the level of coercion that Scott alleges occurred that by approaching, you know, a mother who who was a very emotionally vulnerable at the time in presenting a rationale that was based on an incorrect legal theory and expecting her to use her own influence as his mother to get him to go along with what the attorney believed was the was the right choice when it should have been Scott's decision alone after, you know, being after having an informed conversation with his attorney. But Miss Cook, the real issue here is that the trial court judge asked Mr. Scott whether or not he wanted to testify. He said no. So what more could the trial court judge have done? And I realize that you're saying that this is an effective assistance of counsel situation because the attorney somehow influenced the mother to influence him. And but but he had he had the final say here. And that's the real question is he made the decision that he did not want to testify. You agree with that, correct? Your Honor, I agree that that's what he stated on the record, but his his explanation for that was that his his feeling was he was not convinced that this was the right choice. He spoke out almost immediately after he was found guilty. And then at the initial. I don't mean to cut you off, Miss Cook, I just want to because you're kind of going into another direction. Couldn't he have said to the judge, judge, I'm actually not sure if I want to testify. My mother is telling me that I shouldn't testify because my counsel told her to tell me this, but I'm not sure if I should testify. That would have created a real issue at that point that the trial judge could have then dealt with that. But Mr. Scott never brought that to the judge's attention. Your Honor, it's correct, he didn't bring it up at that time, but I think that was the nature of the coercion is that he felt so pressured into saying this. And in fact, it was a very brief colloquy on this issue. The judge did not ask any follow up questions, as is often the case about whether anyone had pressured him to make this decision. Well, OK, and also I want to just kind of jump to something else here, because I believe that Judge Woloski so carefully and meticulously handled this on remand, I realized she was not the trial judge. So, of course, she had to ask a lot more questions that she would not have had to ask as she'd been the trial judge. In what way do you believe that somehow the trial judge made the wrong decision here? Tell us that. Well, Your Honor, for example, the question of the 9-1-1 call, this was an issue where Scott had a clear recollection of what the 9-1-1 caller said, that she saw only a single offender. Ruffin at the at the preliminary hearing did not recall the description that she gave. He actually didn't even recall whether or not this caller had testified. And so there was a dispute of fact between the two about the content of this call and whether it would have been important to his defense. Rather than simply deferring to counsel Ruffin's representations about the call, the judge could have simply listened, you know, asked for the 9-1-1 tape to be produced and listened to it. It had never been played in court previously. So no judge had reviewed the content of the call. So rather than, you know, resolving this issue of fact in favor of Attorney Ruffin, the judge could have listened to the call and decided whether or not this potentially could have assisted with his defense. And this is which which Scott specifically asked the judge to do. And she, you know, she did not. I would also argue that her her questioning of both Scott and Ruffin indicates that she was not familiar with the trial record, that she she asked questions about which witness testified and what they said and what was in the exhibits. And her questioning leads to the conclusion that she she had not reviewed the trial record. She stated at the hearing that she was going to order a transcript of the hearing itself, where Ruffin presented his allegations of ineffective assistance of counsel. And she did receive that transcript. But at no time did she say that she had reviewed the trial transcripts. And I would argue that the purpose of this court's remand for an independent review by a new judge was precisely so that a new judge would take a fresh look at the allegations and in order to to do so would need to be informed, at least about the aspects of the trial record that relate to the claims being made regarding ineffective assistance of counsel. Well, that's what you just said. That's why she was asking a lot of questions. Maybe, you know, sometimes judges ask questions they may know the answer to. And sometimes they want to make sure they understand it right now, what the facts are and make sure they have it straight in their head. So the fact that she asked a lot of questions shows that she was not necessarily unprepared, but very prepared and wanted to make sure she had the facts right. So she has a lot of questions. And then another possible explanation. Well, Your Honor, she did ask questions, but on on every contested issue, she simply deferred to defense counsel Ruffin's representations. You know, for example, if she asked, did you cross examine this witness? And he said, oh, yes, I asked all those questions. You know, instead of simply relying on what he said, she could have looked at the trial transcript and see, did he effectively cross examine the witness? Just as an example. Is that in your. So you're saying we should reverse because she she did what? She didn't read the transcripts. You say that's a requirement under Crankle that if a judge is unfamiliar, they have to somehow put on the record that they read it. And you say she didn't put it on the record. Is that your argument? Well, Your Honor, I think that she did not conduct a thorough enough investigation into the client's claims of ineffective assistance. You know, if taking just one example of the 911 call, you know, it would not have been too difficult to play the call and to determine which you know, which person had a better recollection or more accurate recollection of what the caller said. My understanding is that it's not clear what's on the tape. That's in the record that I mean, there is no transcript, right? Correct, Your Honor. Right. There was no tape's not in the record either, the actual tape, but there is testimony that it was. What was said on the tape was not clear. It was a problem, I guess, with. Trying to figure out what people were saying. Well, Your Honor, Attorney Ruffin said she didn't give a clear description. However, Attorney Ruffin didn't even remember whether or not she had appeared in trial, which she did not. She was never called to testify. And what does that have to do? So why would that be effective? Because the judge relied on Ruffin's representation of something that he clearly did not remember very accurately. Well, that's your opinion. She could have found him credible and what he was saying and trying to remember. You want to go on your other argument? Excuse me for just a minute. Your Honor, I think I think we've covered the substance of my argument, so if there are no further questions, I'll just reserve the rest of my time for rebuttal. Thank you very much. Ms. McGann. Thank you, Your Honors, may it please the court, Your Honors, on remand here, the trial court followed this court's order, wherein it provided defendant a new judge, Judge Woloski, without any adversarial participation by the state. That was clear. You have listened to the tape since you have gotten the tape or try to get a transcript. Isn't that something that's important here? Your Honor, with regards to the 9-1-1 tape, I think by def by virtue of defendant's own statement to Judge Woloski, he had an issue with the tape because it referenced a gray hoodie and he was wearing a brown hoodie. And I think we're really splitting hairs with, you know, regards to the other contents, what it was, was a discrepancy in the description. And what we do know from the trial record is that this was a Jessica Jackson who made the 9-1-1 call and by way of Detective O'Connor's testimony, we know that he spoke with Ms. Jackson and that this testimony came through, that there was this discrepancy in the description. And we did have discrepancies in the description of what defendant was wearing throughout. I would point out that, um, your Honor's references that Judge Woloski gave defendant the due consideration he needed here to explain his complaints at this, at this new Krinkle hearing. He had ample time without interruption to explain all of his complaints. It was only then that Judge Woloski referenced that she was going to review transcripts. And it was during an exchange with defendant when he was referencing his motion and other references to the trial. So it was on January 26th that Judge Woloski said, I'm going to take a continuance date and then I'm going to review transcripts. On that next date, February 3rd, the court then allowed defendant to expand a bit more on his claims and then gave the trial counsel the opportunity to explain his decisions. It was only then trial counsel defended his decisions, explained them. And there was an exchange between the trial court and trial counsel. So just so I understand what you're saying, uh, you're disagreeing with Ms. Cook in that you're saying the record reflects that she did review the trial transcript. Your Honor, I would say, uh, yes, your Honor, on page 57 of the transcript, the, there is the implication that Judge Woloski was taking a continuance to review the transcripts from the trial because then on the date, um, in between where she makes her ruling on the crankle hearing, she references that she's going to review the prior crankle hearing transcripts. So I think that's indicative that she reviewed both. And I would point out she was very thorough as Justice Walker pointed out. She, she took her time here and even going back to review the preliminary crankle hearing, um, it's evident that she reviewed the claims that defendant made there. She didn't reference any of the state's interruptions or anything. It's just, she was trying to put it all together before she essentially was going to deny defendant, um, this, you know, second crankle inquiry and therefore the trial court did follow the proper inquiry. And the standard here was that defendant was supposed to show a possible neglect and he failed to do so. Let's take up a second though, uh, Ms. McKinnon, let's go, Ms. McKinnon, let's go to the issue though, of the conversation with mom and having mom to convince him not to testify. Now we all understand that it's, it's the defendant's right as to whether or not it was Mr. Scott's right as to whether or not he wanted to testify. And it was not, uh, up to counsel to, to determine whether or not he had, he should testify. So do you believe that that was inappropriate? That's what Ms. Cook is arguing that he basically twisted his arm and, uh, used his mom to twist his arm. And ultimately he told the trial judge he didn't want to testify and that that's where the problem lies. That's what Ms. Cook is arguing. Yes. Uh, Justice Walker, I completely disagree with Ms. Cook's position on that. I think on the face of this record, we have a, an attorney who's very candid when he's about that conversation with defendant. In fact, he says, I 100% told him not to testify because, you know, all signs would point to just corroborating, you know, this story that he was on the scene there. So did the judge need to hear judge Linehan that is over and over that the judge is on the scene of this armed robbery. The judge is already hearing that, um, you know, by virtue of the other testimony at trial, defendant made that decision on his own. He was admonished by judge Linehan and he emphatically or, you know, explicitly said, yes, that was his decision. So the state's position is that, um, defendant has, has no ineffective assistance of counsel claim in this regard or any, any of the other claims for that matter. Uh, but moving on as far as the witnesses go, I would, um, you know, first point out we have judge Woloski who heard defendant's claims here, which were the three witnesses, Risa Phillips, Margie Smiley, and Jessica Jackson, that counsel was, you know, showed possible neglect by not calling them. But again, by virtue of defendant's own statements to the court, these witnesses were subpoenaed. We have no reason to believe that the, that trial counsel did not investigate these witnesses and discuss their possible testimony. And that only leads us to believe that he made the strategic strategic decision to not have them testify. It was not going to be favorable to defendant. And again, it would be redundant. And really those witnesses by their accounts, by defendant's account to the court is that they place them on the scene going in and out of the building and no one sees the shooting. So unhelpful to defendant, clearly sound strategy on the part of defense counsel. Um, as far as any reference to sort of the rest judicata nature here, issue that counsel, um, poses to this court, again, it's, it's very clear that judge Woloski, uh, did a careful, careful review of the trial record of the previous Prankle, Prankle hearing inquiry of this court's mandate before thoughtfully hearing from defendant on two occasions, taking two court dates to, um, give careful review to the transcripts and then by thoughtfully, um, asking trial counsel questions so that she could glean whether or not this was, did amount to possible neglect. Ultimately judge Woloski's decision was proper and the state would, uh, ask this court to please affirm her denial of defendant's ineffective assistance of counsel claims at Prankle. And for those reasons and all reasons in the people's brief, we would ask that this court, uh, give counsel the opportunity to respond to this court's questions. Hearing none, Ms. Cook. Um, thank you, your honor. I would just like to respond to one, uh, issue, which was, uh, counsel stated that none of the proposed witnesses who, um, uh, Scott asked to have been called to testify at his trial had actually seen the shooting. Um, as an issue matter, we don't, we don't know exactly what they would have testified to, um, these, you know, this is entirely new information. Um, except that Jessica Jackson, as the 911 caller apparently did see the shooting and according to what Scott represented had only seen one offender. And in addition, Scott said that the niece, uh, Londell Favors' niece, Rissa was watching the shooting from the front window and also would have, would say that she saw only a single offender. And so, you know, with, without calling these witnesses to testify, there's, it's complete speculation to say that they would not have, um, that that, you know, that their testimony would not have altered the outcome of the trial. Um, unless there are any, uh, further questions, I would, um, ask this court to reverse the lower court's denial of relief on the ineffective assistance claim and remand for new proceedings. Thank you, your honors. I thank both of you for your arguments and for your briefs. We'll take this matter under advisement and, uh, rule accordingly. Thank you very much. Have a good afternoon. Thank you, your honors. Thank you, counsel. Thank you, your honors. Thank you.